509 A.2d 838

AMERICAN TRUCKING ASSOCIATIONS, INC.,
et al., Appellees,

v.

James I. SCHEINER, Secretary of the Department of
Revenue, et al., Appellants.   (Two Cases)

AMERICAN TRUCKING ASSOCIATIONS, INC.,
et al., Appellants,

v.

James I. SCHEINER, Secretary of the Department of
Revenue, et al., Appellees.

Supreme Court of Pennsylvania.

Argued Sept. 17, 1985.

Decided May 6, 1986.

432

---

Maura A. Johnston, Andrew S. Gordon, Allen C. Warshaw, Office of Atty. Gen., Harrisburg, for appellants.

Arthur Littleton, Hoyle, Morris & Kerr, Philadelphia, Mark P. Pazuhanich, Hanna, Young & Upright, Stroudsburg, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.*

On September 17, 1985, this Court heard oral argument in these three related appeals which arise from class action suits challenging the constitutionality of certain highway user fees and taxes imposed by the Commonwealth of Pennsylvania upon interstate motor carriers whose vehicles travel upon Pennsylvania roads, highways and bridges. To place these constitutional challenges in proper perspective, it is necessary and beneficial to first provide an overview of the salient provisions of our Vehicle Code, 75 Pa.C.S.A. §§ 101–9910 and taxing statutes.

## I

## PENNSYLVANIA HIGHWAY USER FEES

### A. OVERVIEW

Our General Assembly has enacted a comprehensive and highly complex system of highway user fees, charges and taxes (hereinafter referred to as "highway user fees") designed to partially reimburse the Commonwealth of Pennsylvania for expenditures made for maintenance, construction and restoration of our extensive system of interstate highways, roads and bridges, and for expenditures made for the administration and enforcement of our Vehicle Code which governs all aspects of the use of our highways (*e.g.*, safety, vehicle characteristics, registration and licensing, regulations concerning the operation of motor vehicles, etc.). Given that the Commonwealth of Pennsylvania is a major thruway for interstate commerce along the northeast corridor, and given its hilly terrain and frequently severe weather conditions which accelerate roadway and bridge deterioration in combination with heavy use by large tractors and trailers engaged in interstate commerce, these expenditures are, of course, enormous.

Pennsylvania's highway user fees include the following:

* This case was reassigned to this writer on March 12, 1986.

(a) truck and truck-tractor registration fees;

(b) trailer registration fees;

(c) truck and truck-tractor title fees;

(d) trailer title fees;

(e) registration transfer fees;

(f) special handling permit fees;

(g) special trip permit fees;

(h) Fuel Use Tax;

(i) Motor Carriers Road Tax;

(j) Oil Company Franchise Tax;

(k) Gross Receipts Tax (on vehicles traveling interstate);

(l) Liquid Fuels Tax;

(m) farm truck registration fees.[1]

As will be explained more fully, certain of these highway user fees (such as registration fees and titles) are "fixed" while others (such as the Liquid Fuels Tax, the Fuel Use Tax and the Motor Carriers Road Tax, *see* note 1, *supra*) are related to and dependent upon a motor carrier vehicle's actual use of Pennsylvania highways. All of the various highway user fees are "credited to the Motor License Fund and expended exclusively for road-related purposes." Joint Stipulation of Facts (hereinafter "JSF") at No. 315 C.D. 1982, No. 11 M.D.Appeal Docket 1985, para. 64.

Owners of motor vehicles that are based in Pennsylvania must register those vehicles with the Department of Transportation and must pay the registration fee applicable to the particular type of vehicle. 75 Pa.C.S.A. Chapter 13 (Registration) and Chapter 19 B (Registration Fees). These registration fees are paid by owners of Pennsylvania-registered vehicles in addition to the other various highway user fees outlined above.

---

1. Joint Stipulation of Facts (hereinafter "JSF") at No. 315 C.D.1982, No. 11 M.D.Appeal Docket 1985, paras. 64, 65–98. *See* the Vehicle Code, 75 Pa.C.S.A. Chapters 13 (Registration of Vehicles), 19 (Fees) and 95 (Taxes for Highway Maintenance and Construction), *and* the Fiscal Code, Pa.Stat.Ann. tit. 72, §§ 2611a–2611z (Tax on Liquid Fuels), §§ 2614.1–2614.24 (Fuel Use Tax), §§ 2617.1–2617.26 (Motor Carriers Road Tax).

The complexity of a state's scheme for imposition and collection of highway user fees is greatly compounded by the very nature of the interstate highway system and its use by motor vehicles registered in all of the United States and foreign countries with each jurisdiction generally having its own registration fees and other taxes applicable to those vehicles. In light of this multiplicity of sovereign interests, the General Assembly has declared:

It is the policy of this Commonwealth to promote and encourage the fullest possible use of its highway system by authorizing the making and execution of reciprocal agreements, arrangements and declarations with other states, provinces, territories and countries with respect to drivers, licensed and vehicles registered in this and other states, provinces, territories and countries, thus contributing to the economic and social development and growth of this Commonwealth.

75 Pa.C.S.A. § 6141, Declaration of policy. *See* 75 Pa.C. S.A. §§ 6141–6153, Chapter 61, subchapter C, (Reciprocity). The Secretary of the Department of Transportation is authorized to execute agreements or arrangements with other jurisdictions granting to "drivers or vehicles or owners of vehicles properly licensed or registered in those jurisdictions ... benefits, privileges and exemptions from the payment ... of any taxes, fees or other charges" imposed upon Pennsylvania drivers, vehicles and owners provided that "drivers or vehicles properly licensed or registered in this Commonwealth ... shall receive exemptions, benefits and privileges of a similar kind or to a similar degree as are extended to drivers or vehicles properly licensed or registered in ..." the other jurisdiction. 75 Pa.C.S.A. § 6143. It is further provided in that section that:

Each agreement or arrangement shall, in the judgment of the secretary, be in the best interest of this Commonwealth and the citizens thereof and shall be fair and equitable to this Commonwealth and the citizens thereof, and shall be determined on the basis and recognition of

the benefits which accrue to the economy of this Commonwealth from the uninterrupted flow of commerce.

Prior to September, 1982, Pennsylvania had entered into bilateral Apportioned Registration Agreements with twenty-three states and provinces, which agreements were based upon the International Registration Plan (hereinafter the "IRP"). On September 15, 1982, Pennsylvania became a member jurisdiction of the IRP. Under both the former bilateral agreements and the IRP, registration fees for "apportionable vehicles" were/are determined: by dividing the in-jurisdiction miles by the total miles during the preceding year to produce a fraction; (2) by determining the total fee required under the laws of each jurisdiction for full registration of each vehicle; and (3) by multiplying the total fee for each state by the fraction of in-jurisdiction miles to total miles. JSF para. 102.[2] No state which is contiguous to Pennsylvania was an IRP member at times relevant to these appeals.

## B. THE MARKER DECAL FEE AND ACT 68

The Act of June 18, 1980, P.L. 229, No. 68 (hereinafter Act 68) amended the Vehicle Code by adding chapter 21, Motor Carriers Road Tax Identification Markers, which operated in conjunction with the Motor Carriers Road Tax Act. 75 Pa.C.S.A. § 2101–2105, as amended. The latter Act, part of the Fiscal Code, taxes liquid fuels purchased outside the Commonwealth but consumed while traveling within it. 72 P.S. §§ 2617.1–2617.26. Act 68 requires every

---

**2.** For example, assuming a motor carrier vehicle based in any IRP state traveled 50% of its miles in the Commonwealth, 40% in state A, and 10% in state B, and assuming the full registration fees for those states were $400, $300, and $200 respectively, the registration fees paid by that vehicle would be as follows (if states A and B are IRP-member jurisdictions):

| To Pennsylvania: | 50% × $400 = | $200 |
|---|---|---|
| To state A: | 40% × $300 = | $120 |
| To state B: | 10% × $200 = | $ 20 |
| Total registration fee: | | $340 |

JSF at para. 103.

motor carrier vehicle [3] operating in Pennsylvania to display an identification marker to be issued by the Department of Revenue upon payment of a fee. Purchase of the identification marker decal notifies the Commonwealth that the motor carrier vehicle is subject to the Road Tax Act and triggers that Act's reporting, record-keeping and tax-paying requirements. Pennsylvania-registered motor carrier vehicles are not required to bear these marker decals because the act of registration notifies the Commonwealth that the vehicle is subject to the Road Tax Act and the Pennsylvania license plate provides the identification marker necessary to facilitate enforcement. § 2102(d)(1).

Act 68 further provided:

2102(b) **Fee.**—The fee for issuance of an identification marker shall be $25, except that for vehicles registered in this Commonwealth, the vehicle identification marker fee shall be deemed a part of and included in the vehicle registration fee.

This fee is a "tax for the privilege of using Pennsylvania roads." JSF para. 1. The administrative costs associated with the issuance of the marker decal are approximately $5.00; the balance of the marker fee is credited to the Motor License Fund and expended for road-related purposes such as highway maintenance, construction, state police operations and construction bond debt service. JSF paras. 4, 5 and 46.

Section 2 of Act 68 also simultaneously amended section 1916(a) of the Vehicle Code and increased registration fees for all Pennsylvania-registered motor carrier vehicles. The smallest registration fee increase was $45.00 (for Class 7 vehicles, or motor carrier vehicles with "gross or combination weight" of 17,000–21,000 pounds), graduating upward to $228.00 (for Class 20 vehicles, or motor carrier vehicles with "gross or combination weight" of 68,001–73,280

---

**3.** Act 68 defined "motor carrier vehicle" as "A truck, truck tractor or combination having a gross weight or registered gross weight in excess of 17,000 pounds."

pounds). In every case, therefore, the registration fee increase exceeded the amount of the marker fee ($25.00).

Act 68 further provided that operation of a motor carrier vehicle in Pennsylvania without an identification marker was unlawful unless exempted by regulation or unless a five-day permit had been obtained for a $5.00 fee where enforcement of the identification marker decal provisions "would cause undue delay and hardship in the operation of such motor carrier vehicle or vehicles." 75 Pa.C.S.A. § 2102(d).

### C. THE AXLE TAX AND ACT 234

The Act of December 8, 1982, P.L. 842, No. 234 (hereinafter "Act 234") added Chapter 99, Axle Tax for Highway Bridge Improvement, to the Vehicle Code. 75 Pa.C.S.A. § 9901–9910, as amended. Act 234 also amended section 2102(b) by reducing the marker fee to $5.00 as of March 31, 1983.[4] 75 Pa.C.S.A. § 2102(b).

Act 234 imposed an axle tax upon all motor carriers[5] as follows:

> In addition to any other tax imposed by law, all motor carriers shall pay an annual tax in the amount of $36 per axle on every truck, truck tractor or combination having a gross weight or registered gross weight in excess of 26,000 pounds operated on the highways of this Commonwealth.

75 Pa.C.S.A. § 9902. This tax must be paid "at the time a motor carrier applies for vehicle registration or for the issuance of an identification marker or permit pursuant to section 2102...." 75 Pa.C.S.A. § 9903. The full axle tax applies to all motor carrier vehicles, regardless of state or province of registration, which travel at least 2,000 miles annually in this Commonwealth; vehicles traveling less than 2,000 miles annually are entitled to a rebate prorated

---

4. The $5.00 marker fee has not been challenged in these actions.
5. Act 234 defines "motor carrier" as "Every person who operates or causes to be operated any motor vehicle on any highway in this Commonwealth." 75 Pa.C.S.A. § 9901.

in accordance with the actual mileage.[6] 75 Pa.C.S.A. § 9905. Additionally, payment of the axle tax is excused if the motor carrier has obtained a 5 day trip permit for $25. 75 Pa.C.S.A. § 2102(d).

The Legislature has declared the purpose of the axle tax as follows:

It is the declared policy of the Commonwealth that the money raised by the tax imposed by this chapter be used, to the greatest extent possible, to provide for the creation of jobs and the rehiring of the unemployed in this Commonwealth. In order to reach this goal, firms with Pennsylvania-based facilities shall be actively solicited to make bids on contracts to furnish products and materials, including, but not limited to, steel and steel products, to be used in the projects funded through the Highway Bridge Improvement Restricted Account.

75 Pa.C.S.A. § 9907(b). To that end, all proceeds from the axle tax and trip permits are to be "deposited in the Highway Bridge Improvement Restricted Account within the Motor License Fund" and appropriated for expenditure on bridge rehabilitation, replacement and removal projects. 75 Pa.C.S.A. § 9907(a) and 9908.

Section 1 of Act 234 simultaneously amended section 1916(a) of the Vehicle Code and, beginning with the weight class upon which the axle tax is first imposed (26,001–30,000 pounds), reduced the annual Pennsylvania truck or truck tractor registration fees in multiples of $36.00. The practical operation of this simultaneous reduction in registration fees was explained by the Commonwealth Court:

The incremental $36.00 registration fee reductions roughly correspond to the number of axles legally required for vehicles of various weights. Permissible maximum gross weights for two-axle, three-axle and four-axle trucks are 38,000 pounds, 58,400 pounds and 73,280 pounds, respectively. *See* 75 Pa.C.S. § 4941(c). Vehicles

6. The rebate is calculated in accordance with the following formula:

$$\frac{2000 \text{ miles - actual miles traveled}}{2000 \text{ miles}} \times \text{axle tax paid} = \text{rebate}$$

registered with maximum gross or combination weights of 26,001–40,000 pounds, 40,001–60,000 pounds, 60,001–73,280 pounds and 73,281–80,000 pounds, sustained registration fee reductions in amounts of $72.00, $108.00, $144.00 and $180.00, respectively. Registration fee reductions generally offset the tax owed based on the number of axles ordinarily required of vehicles within each affected weight class.[3]

[3.] The correspondence between registration fee reductions and the number of axles is not perfect. For example, trucks weighing between 38,001 and 40,000 pounds are required to have three axles, yet registration fees were reduced by $72.00 rather than $108.00.

*American Trucking Associations, Inc. v. Bloom,* 87 Pa. Commw. 345, 487 A.2d 465, 467 & n. 3 (1985).

II

THE CLASS ACTION SUITS

A.  AMERICAN TRUCKING I

No. 11 M.D.Appeal Docket 1985 (Appeal from Order of the Commonwealth Court entered at No. 315 C.D.1982)

Appellees are American Trucking Associations, Inc. (ATA), a non-profit corporation/federation of 51 state trucking associations and 13 national conferences, and two non-Pennsylvania corporations engaged in the interstate motor carrier business. As plaintiffs below, appellees filed an original class action complaint with the Commonwealth Court seeking to have section 2102(b) of the Vehicle Code, the marker fee, declared unconstitutional. Appellees were certified to represent a class of plaintiffs consisting of all interstate motor carriers whose vehicles are registered outside of Pennsylvania and who are or will be subject to the identification marker and marker fee requirement imposed by Act 68. Appellants are James I. Scheiner, Secretary of the Department of Revenue, Leroy S. Zimmerman, Attorney General of the Commonwealth, and Jay Cochran, Commissioner of the Pennsylvania State Police.[7]

[7.] Appellant Scheiner succeeded Robert K. Bloom, an original defendant, as Secretary of Revenue during the pendency of this action and

The complaint set forth the following challenges to the constitutionality of the marker fee: that it was discriminatory and unduly burdensome under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3; that it violated the Privileges and Immunities Clause, Art. IV, § 2; that it violated the Equal Protection Clause, amend. XIV and the Uniformity Clause of the Pennsylvania Constitution, Art. VIII, § 1; and that it violated the Supremacy Clause, Art. VI, cl. 2.[8] The gravamen of most of these allegations is discrimination perceived against interstate commerce in favor of local commerce in that, by "deeming" the marker fee to be part of and included in the Pennsylvania registration fee, Act 68 actually imposed the $25.00 marker fee "exclusively upon motor carrier vehicles registered outside of Pennsylvania for the privilege of using the highways of the Commonwealth." Complaint paras. 42, 50, 52, 61. The second principal contention was that Act 68 imposed an "unlawful burden" under the Commerce Clause upon interstate motor carriers because the market fee is a flat tax that is "wholly unrelated to the volume, value or nature of the services provided by the Commonwealth" and is "wholly unrelated to the magnitude or nature of any benefit received by or conferred upon" interstate motor carriers. Complaint para. 46.

Appellees' prayer for relief sought a declaration that section 2102(b) of the Vehicle Code (as originally enacted by Act 68) was unconstitutional and sought an injunction against its enforcement. Additionally, appellees sought immediate refund of "any $25.00 payments received from

was, therefore, substituted under Pa.R.A.P. Rule 502. Similarly, appellant Cochran replaced the late Daniel F. Dunn, an original defendant, as Commissioner of the Pennsylvania State Police.

**8.** Although the Commonwealth Court decided only the Commerce Clause issue in appellees' favor, appellees reiterate all of the remaining constitutional objections in their appeal before this Court, except for the Supremacy Clause argument. Accordingly, the Supremacy Clause challenge has been abandoned.

interstate motor carriers on account of marker fees for the year commencing April 1, 1982." [9]

The parties filed an elaborate Joint Stipulation of Facts. Additionally, trial was held before the Honorable Robert W. Williams, Jr., under the original jurisdiction of the Commonwealth Court concerning the validity of appellees' survey which purported to establish the discriminatory impact of the marker fee upon foreign registered vehicles. The trial court held that the marker fee discriminated against such vehicles and in favor of Pennsylvania registered vehicles, declared section 2102(b) of the Vehicle Code unconstitutional under the Commerce Clause, and ordered refund of marker fee payments made after April 1, 1982 pursuant to stipulation of the parties regarding refunds. 77 Pa. Commw. 575, 466 A.2d 755 (1983). The amount of the refund would be approximately ten million dollars, payment of which has been deferred pending "final decision" of this matter, pursuant to stipulation.

Exceptions were taken to the trial court's order which the Commonwealth Court overruled *en banc.* 87 Pa.Commw. 345, 487 A.2d 468 (1985) (Opinion per Williams, J.; Crumlish, P.J. and Barry, J., dissenting). The Commonwealth Court viewed the issue as "whether the Legislature intended to, and actually did, incorporate the $25.00 marker fee

9. Appellees were also certified to represent a subclass of plaintiffs in this class action at No. 315 C.D.1982. This subclass consisted of all interstate motor carriers whose vehicles were registered in any of the states or provinces with which Pennsylvania had entered into bilateral Apportioned Registration Agreements and whose vehicles were or would be subject to the $25.00 marker fee. Count VII of the complaint asserted, alternatively, that this subclass was being discriminated against because payment of the marker fee by its members, who also paid an apportioned Pennsylvania registration fee that was "deemed" to include that marker fee, amounted to payment in excess of the $25.00 marker fee. Refund of the excess was demanded. In April, 1982, the Department of Transportation announced that, because Pennsylvania registration fees were deemed to include the $25.00 marker fee, $25.00 was to be subtracted from the registration fees before they were apportioned. Refunds were ordered and have been made by the Commonwealth of the amounts in excess of $25.00 erroneously received from members of this subclass prior to April, 1982. Accordingly, Count VII of the complaint has been rendered moot and is not an issue in this appeal.

when it increased Pennsylvania-based motor carrier vehicle registration fees under Act 68." *Id.* at 350, 487 A.2d at 470.

That court identified the appropriate standard of review of legislation alleged to be violative of the Commerce Clause:

> Local taxation of interstate commerce does not violate the Commerce Clause when the levy (1) is applied to an activity with a substantial nexus to the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce and (4) is fairly related to local services. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977). A state tax's validity under the Commerce Clause must be measured by the statute's actual effect on interstate commerce in the context of the state's entire, interrelated taxing scheme. *Maryland v. Louisiana,* 451 U.S. 725, 756, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576 (1981) (Louisiana's "first-use" tax on natural gas invalidated because local users benefited by a series of exemptions and credits).

*Id.* at 350, 487 A.2d at 471.[10] Nevertheless, the Commonwealth Court focused on legislative history preceding the adoption of Act 68 and "divine[d] a legislative intent to exempt Pennsylvania-registered motor carrier vehicles from payment of the $25.00 marker fee." *Id.*[11] Accordingly, the

---

**10.** The parties agree that the validity of the highway user fees challenged in these appeals under the Commerce Clause is governed by the four-part test enunciated by the United States Supreme Court in *Complete Auto.*

**11.** That court's "divination" of the discriminatory legislative intent was based upon the following analysis:

Act 68's precursor, Senate Bill No. 10 (Printer's No. 965), significantly raised motor carrier vehicle registration fees, without including a marker fee provision, when first reported from Transportation Committee on June 25, 1979. On July 10, 1979, a $5.00 identification marker decal provision was added to Senate Bill No. 10 (Printer's No. 1038). When the $25.00 marker fee was subsequently introduced in Senate Bill No. 10 (Printer's No. 1834), which was reported from Conference Committee on May 27, 1980, the motor carrier vehicle registration fees were never increased to reflect the newly added privilege tax. Moreover, the registration cost for vehicles weighing between 68,001 to 73,280 pounds was reduced by $41.00. Since the Legislature never increased registration fees in

Commonwealth Court affirmed the trial court's finding that section 2102(b) of the Vehicle Code "facially offends the third prong of the *Complete Auto* standard which proscribes discrimination against interstate commerce," *id.* and did not address appellees' remaining exceptions.

Appellants then filed this direct appeal from a final order of the Commonwealth Court in a matter originally commenced therein. 42 Pa.C.S.A. § 723(a).

### B. AMERICAN TRUCKING II

No. 12 M.D.Appeal Docket (Appeal from Order of the Commonwealth Court entered at No. 267 C.D.1983)

Appellees in this action are ATA and four different non-Pennsylvania corporations engaged in the interstate motor carrier business. As plaintiffs below, appellees filed an original class action complaint with the Commonwealth Court seeking to have section 9902 of the Vehicle Code, the axle tax, declared unconstitutional. Appellees were certified to represent a class of plaintiffs consisting of all interstate motor carriers who own vehicles registered outside of Pennsylvania who are or will be subject to the axle tax, as well as a subclass of plaintiffs consisting of such interstate motor carriers who are registered in any of the states or provinces that are not members of the International Registration Plan. Appellants are the same public officials named as defendants in *American Trucking I* who are charged with the duty to administer and enforce the challenged legislation. (*See* note 7, *supra* and accompanying text). The axle tax was challenged as violative of: the Commerce Clause as discriminating against and unduly burdensome to interstate commerce; the Privileges and Immunities Clause; the Equal Protection Clause; and the Uniformity Clause of the Pennsylvania Constitution. As in *American Trucking I,* the gravamen of most of these allegations is discrimination. Appellees have asserted

response to the subsequent $25.00 marker levy, we *divine a legislative intent to exempt Pennsylvania-registered motor carriers from payment* of the $25.00 marker fee. (emphasis added).

throughout these proceedings that the imposition of the $36 per axle tax upon all motor carrier vehicles, accompanied by Act 234's simultaneous reduction in the Pennsylvania registration fees almost exactly offsetting the amount of the axle tax for Pennsylvania registered vehicles, was facially and actually discriminatory and imposed the full burden of the axle tax upon non-Pennsylvania registered interstate motor carriers. Complaint paras. 42, 43, 50, 52, 56. Appellees' second principal contention was that Act 234 imposed an "unlawful burden" upon interstate motor carriers because the axle tax is a flat tax that is unrelated to the "volume, value or nature of the services provided by the Commonwealth" and is "wholly unrelated to the magnitude or nature of any benefit received by or conferred upon" interstate motor carriers. Complaint par. 46.

Appellees' prayer for relief sought a declaration that section 9902 of the Vehicle Code (Act 234) was unconstitutional and sought an injunction against its enforcement. Appellees also sought "repayment of all sums already collected by defendants pursuant to the Axle Tax forthwith together with interest."

Appellants filed an Answer and New Matter asserting that the axle tax is imposed equally upon all interstate motor carrier vehicles whether registered in Pennsylvania or outside of Pennsylvania. While the appellants conceded that the reduction in Pennsylvania registration fees equaled the amount of the axle tax in most cases, and substantially offset the amount of the axle tax in the other cases, they denied that Act 234 or the axle tax discriminated against non-Pennsylvania registered interstate motor carriers or that it placed an unlawful burden upon interstate commerce. The crux of appellants' defense is and has been that Act 234, imposing the axle tax while reducing Pennsylvania registration fees, "effects a rational restructuring of Pennsylvania's highway user charges" which increased the burden borne by those interstate motor carriers who had been least burdened before, *i.e.*, those carriers who did not pay Pennsylvania's substantial (higher than the national

average) registration fees. Thus, appellants argue that Act
234 does not discriminate against appellees and that, in fact,
"local commerce" (Pennsylvania registered interstate motor
carriers) bears more of the burden of Pennsylvania's high-
way user fees than does "interstate commerce" (non-Penn-
sylvania registered interstate motor carriers).

Both sides filed extensive affidavits of fact regarding
expenditures of funds received by imposition of the axle
tax, the impact of that tax upon various categories of
highway users, etc. Although some of the factual asser-
tions were disputed, both sides filed cross-motions for sum-
mary judgment. The Commonwealth Court *en banc* grant-
ed appellees' motion for summary judgment, denied appel-
lants' motion, declared section 9902 of the Vehicle Code
unconstitutional under the Commerce Clause, and ordered
refunding of axle tax payments made by affected class
members after April 1, 1983 in accordance with stipulations
reached by the parties concerning refunds. 87 Pa.Commw.
379, 487 A.2d 465, 468 (1985) (per Williams, J.; Crumlish,
P.J., and Barry, J. dissenting). That court held:

> Commerce Clause jurisprudence distinguishes between
> two types of legislation: (1) protectionist measures that
> are infused with discriminatory purpose or effect and (2)
> facially neutral acts that regulate evenhandedly to pro-
> mote legitimate local interests, with incidental effects on
> interstate commerce. *See Philadelphia v. New Jersey,*
> 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475
> (1978). Economic protectionist legislation is subject to a
> "virtually per se rule of invalidity," while a facially neu-
> tral measure is invalidated whenever burdens on inter-
> state commerce clearly outweigh putative local benefits.
> *Id.*

> \*     \*     \*     \*     \*     \*

Examining the Axle Tax in conjunction with the simul-
taneously enacted registration fee reductions, we con-
clude that the assessment facially discriminates against
interstate commerce. The registration fee reductions al-
most always offset assessments, virtually insulating oper-

ators of locally but not foreign, registered vehicles from the levy's financial impact. Since the Axle Tax discriminatorily affects the operators of foreign-registered vehicles, who bear the full brunt of the tax, the assessment constitutes economic protectionism and is facially invalid. *See Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977)....

*Id.* at 382, 487 A.2d at 467.

Given this disposition, the Commonwealth Court did not address appellees' other constitutional arguments. Appellants then filed this direct appeal with this Court. Payment of this refund has been stayed pending the outcome of this appeal.

## C. AMERICAN TRUCKING III

No. 19 M.D.Appeal Docket (Appeal from Order of the Commonwealth Court entered at No. 160 C.D.1984).

The appellants/plaintiffs in this class action suit are ATA and the same non-Pennsylvania corporations which are appellees/plaintiffs in *American Trucking I.* Appellees are the same Commonwealth officials who are appellants/defendants in *American Trucking I and II.* Appellants herein inform us that this action is "identical in all respects" to *American Trucking I,* except for the time period for which refunds are sought. This "present action seeks only that relief which was inadvertently not requested in the prior action, the refund of taxes paid in the first two years of the operation of the (marker fee) tax, *i.e.,* August 18, 1980 to March 31, 1982." Brief for Appellants at 4.

The Commonwealth Court granted appellees' preliminary objections and held that it did not have jurisdiction over the case because appellants did not initially seek refunds from the Board of Finance and Revenue under section 503 of the Fiscal Code, 72 P.S. § 503, and hence, had failed to exhaust their administrative remedies. 87 Pa.Commw. 418, 489 A.2d 269 (1985). Appellants then filed this direct appeal, and all three appeals were consolidated for oral argument.

### III

### THE COMMERCE CLAUSE

The Commerce Clause, U.S. Const. Art. I, § 8, cl. 3 provides that the United States "Congress shall have power ... to regulate Commerce with foreign Nations, and among the several States...." The "basic purpose of the Clause" is to "prohibit the multiplication of preferential trade areas destructive of the free commerce anticipated by the Constitution." *Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981), *quoting Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 329, 97 S.Ct. 599, 607, 50 L.Ed.2d 514 (1977). From this basic purpose stems one of the fundamental principles of Commerce Clause jurisprudence, an antidiscrimination principle. *Id.* This principle is that no state, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959).

■ The antidiscrimination principle, and several other principles that have evolved through years of Commerce Clause litigation, have been incorporated into the four-part test enunciated by the United States Supreme Court in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). *Complete Auto* reiterated the oft-stated maxim that a state's taxing law is not *per se* invalid merely because it burdens interstate commerce since interstate commerce may constitutionally be required to "pay its way," *i.e.*, its just share of the state's expenditures for services provided. *Maryland v. Louisiana, supra.* However, the Commerce Clause places limitations on the state's right to tax interstate commerce. A state tax upon interstate commerce will violate the Commerce Clause unless it: (1) has a substantial nexus with the state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the

services provided by the state. *Complete Auto Transit, Inc. v. Brady, supra* at 430 U.S. 277–78, 97 S.Ct. 1078–79; *Maryland v. Louisiana, supra* at 451 U.S. 754, 101 S.Ct. 2133.[12]

■ In applying this test, the focus is always upon the effect or economic consequences of the state tax upon interstate commerce. *See, e.g., Complete Auto, supra; Westinghouse Electric Co. v. Tully,* 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984); *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 615, 101 S.Ct. 2946, 2952, 69 L.Ed.2d 884 (1981) ("In reviewing Commerce Clause challenges to state taxes, our goal has ... been to 'establish a consistent and rational method of inquiry' focusing on 'the practical effect of a challenged tax.' *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425 [100 S.Ct. 1223, 63 L.Ed.2d 510] ... (1980).") As stated in *Maryland v. Louisiana,* supra:

A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme. "In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimi-

12. It could be argued with some authority that the highway user fees in the instant appeals should be judged not by the *Complete Auto* four-part test, but by a test more specifically attuned to these particular types of taxes or fees, namely charges "imposed by the State for the use of state-owned transportation or other facilities or services." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 621, 101 S.Ct. 2946, 2955, 69 L.Ed.2d 884 (1981), *citing Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972); *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939); *Ingels v. Morf,* 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653 (1937). In such cases, it is arguable that only the third and fourth facets of the *Complete Auto* standard are relevant and that the fees or charges will be judged solely to determine whether they discriminate against interstate commerce and whether the fees are "manifestly disproportionate to the services rendered." *Commonwealth Edison Co. v. Montana, supra* at 453 U.S. 622, n. 12, 101 S.Ct. 2956, n. 12; *Evansville-Vanderburgh Airport, supra.* Nevertheless, as the parties and the Commonwealth Court have proceeded in these cases under the *Complete Auto* analysis, and since the "user fee" standards are incorporated within the *Complete Auto* test, we will apply *Complete Auto* in our analysis of the challenged statutes.

nation against interstate commerce." *Best & Co. v. Maxwell,* 311 U.S. 454, 455–56, 61 S.Ct. 334, 335, 85 L.Ed. 275 (1940).

451 U.S. at 756, 101 S.Ct. at 2134 (further citations omitted).

■ The delicate balance between conflicting state's interests (the right to charge a user for services rendered) and those of interstate commerce (to be free of unlawful and unfair burdens and regulations) requires careful analysis of "the unique characteristics of the statute at issue and the particular circumstances in each case." *Boston Stock Exchange v. State Tax Commission, supra* at 429 U.S. 321, 97 S.Ct. 603; *Westinghouse Electric Co. v. Tully, supra.* Moreover, in challenging the constitutionality of a state's taxing legislation under the Commerce Clause, the burden is on the challenger to overcome the presumption of validity given to all such legislation. *Evansville-Vanderburgh Airport, supra* at 405 U.S. 713, 92 S.Ct. 1353; *Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 548, 70 S.Ct. 806, 809, 94 L.Ed. 1053 (1950). *See also The Statutory Construction Act of 1972,* 1 Pa.C.S.A. § 1922(3) (The General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth). It has been previously noted, "[Pennsylvania] case law involving the constitutionality of state taxation places a very heavy burden on those who seek to upset such taxation." *Campbell v. Coatesville Area School District,* 440 Pa. 496, 501, 270 A.2d 385, 388 (1970). *See also Leonard v. Thornburgh,* 507 Pa. 317, 489 A.2d 1349, 1351–52 (1985) (tax legislation will not be declared unconstitutional unless it "clearly, palpably, and plainly violates the constitution"). Thus, the burden is upon the party challenging a statute's constitutionality to "clearly, palpably, and plainly" show that the statute violates the Constitution. *Commonwealth v. Robinson,* 497 Pa. 49, 53, 438 A.2d 964, 966 (1981).

With the foregoing standards to guide us, we will review the marker fee and the axle tax to determine their validity under the Commerce Clause.

## A. THE MARKER FEE—ACT 68 AMERICAN TRUCK-ING I

As noted, the $25.00 marker fee imposed by Act 68 (then-in-effect 75 Pa.C.S.A. § 2101(b)) is a flat fee imposed for the privilege of using Pennsylvania's highways. The marker fee clearly satisfies the first two elements of the *Complete Auto* test. It is applied to an activity—the use of Pennsylvania's highways for interstate commerce—with a substantial nexus to Commonwealth. There is also no issue as to whether it is "fairly apportioned" between several taxing states each having a substantial nexus with the activity (as with a tax on gross sales receipts wherein two or more states have contributed to the sales and may each, therefore, lay claim to some portion of the receipts) because the activity taxed is a purely local event. Appellees attack the validity of the marker fee under the third and fourth facets of the *Complete Auto* test arguing that it discriminates against interstate commerce and that it is not fairly related to the services provided by the Commonwealth. We reject both arguments.

There is obviously no discrimination if Pennsylvania registered and non-Pennsylvania registered motor carriers are equally burdened by the marker fee. The difficulty is that Act 68 collected $25.00 per vehicle from all motor carriers using Pennsylvania roads, but then "deemed" that fee as incorporated within Pennsylvania's registration fee. Appellees call this "deeming" a clever pretext insulating Pennsylvania registered vehicles from the impact of the marker fee. The Commonwealth Court accepted this argument based upon its finding that the word "deemed" as used in section 2101(b) was vague and ambiguous and its reliance upon the legislative history of Act 68 and its precursor, Senate Bill No. 10, from which it "divined" a discriminatory intent. (See note 11, *supra*.) The Commonwealth Court's finding of ambiguity, its reliance on legislative history and the conclusions that court "divines" therefrom are erroneous.

■ Under our rules of statutory construction we are to resort to an act's contemporaneous legislative history only

when the language of the act is ambiguous. 1 Pa.C.S.A. §§ 1921(b) and (c)(7).[13] Because we find the language of § 2102(b) clear and free from ambiguity, we find the Commonwealth Court's heavy reliance upon Act 68's legislative history unwarranted.

According to Webster's Third New International Dictionary, the common definitions of the word "deem" are "to judge; classify after some reflection; hold." We are obligated to use the common meaning of words when construing statutes. 1 Pa.C.S.A. § 1903. Thus under section 2102(b), for Pennsylvania-registered vehicles, the marker fee has been classified, adjudged or held to be included in the vehicle registration fee. When the language of a statute can be interpreted free of ambiguity, it is not for the court to create an ambiguity. *See e.g. Hellertown Manufacturing Company v. Commonwealth*, 480 Pa. 358, 365, 390 A.2d 732, 735 (1978).

In finding the word "deemed" to be vague, and resorting to legislative history to "divine" a discriminatory legislative intent, it would seem that the Commonwealth Court simply chose not to believe the legislature when it stated that the marker fee is "deemed a part of and included within" Pennsylvania's vehicle registration fees. Thus that court seems to have presumed that the General Assembly intended to violate the Constitution. Obviously, the judiciary has no authority to presume such an unconstitutional motive or intent by a co-equal branch of government. 1 Pa.C.S.A. § 1922(3).

Moreover, and most critically, it was improper for the Commonwealth Court to focus almost exclusively upon the legislative intent since Commerce Clause jurisprudence dic-

---

**13.** Even in that instance, however, the relevant legislative history would be that which is contemporaneous to the time of the act's passage. Here the Commonwealth Court superimposed upon the legislative history of Act 68 that of Senate Bill 10 which was introduced a year before Act 68 and which was never enacted. We cannot assume that the legislative intent is a constant. The legislative intent behind Senate Bill 10 was extinguished when that bill failed to pass, and cannot be superimposed upon the legislative intent behind Act 68.

tates that we assess the state tax "in light of its *actual effect* considered *in conjunction with other provisions of the state's tax scheme,*" and determine whether the statute does *in practical operation work discrimination against interstate commerce. Maryland v. Louisiana, supra* at 451 U.S. 756, 101 S.Ct. 2134. So viewed, it is apparent that the marker fee does not work *any* discrimination against interstate commerce in practical operation.

█ There is no question that Pennsylvania registered vehicles pay a substantial registration fee which members of the class represented by appellees are not subject to. There is also no question that Act 68 actually and simultaneously increased that registration fee by anywhere from $45.00–$228.00 for the vehicles in the class affected by the marker fee. Thus, while the interstate motor carriers in the class represented by appellees were charged $25.00 per vehicle, Pennsylvania registered vehicles were charged that $25.00 *plus increased registration fees of an additional* $20.00–$203.00. There is no discrimination, therefore, against interstate commerce since Act 68 imposed a $25.00 marker fee on all motor carriers in the class represented by appellees and deemed a like amount of the simultaneous increase in Pennsylvania registration fees as the marker fee for Pennsylvania registered vehicles. *In each instance,* Act 68 placed a greater burden upon "local commerce" (Pennsylvania registered motor carrier vehicles) than upon "interstate commerce" (motor carrier vehicles represented by appellees).

Because there is no discrimination in the imposition of the marker fee upon interstate motor carriers represented by appellees, we must uphold Act 68 unless it fails the fourth facet of the *Complete Auto* test, *i.e.* unless it is not fairly related to the services provided by the Commonwealth of Pennsylvania. Such is not the case.

Appellees accept the $5.00 administrative costs associated with the marker fee (*see* note 4, *supra* ) as "fairly related" to the services provided by the Commonwealth, but they contend that the additional $20.00 which goes into the Motor

License Fund is "wholly unrelated" to any services provided by the Commonwealth or received by non-Pennsylvania registered motor carriers. Essentially, this argument is that flat taxes, such as the marker fee, are not fairly related to the services provided by a state because it can reasonably be expected that "interstate commerce" will use those services (the highways and related facilities/services) less than "local commerce", and thus will produce a greater impact upon "interstate commerce" in terms of cost per mile of the marker fee or any other flat tax.[14] This argument misconstrues the nature of the "fairly related" requirement of the Commerce Clause as it applies to flat fees and taxes.

In *Commonwealth Edison Co. v. Montana, supra,* the United States Supreme Court considered a Commerce Clause challenge to Montana's severance tax on coal extracted from within its borders. The appellants there argued that the severance tax discriminated against interstate commerce and that it was not fairly related to the services provided by Montana. Prefatory to its discussion of whether Montana's severance tax was "fairly related" to services provided, that Court stated:

> [I]n reviewing appellants' contentions, we put to one side those cases in which the Court reviewed challenges to "user" fees or "taxes" that were designed and defended as a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities and services. *See, e.g. Evansville-Vanderburg Airport Authority Dist. v. Delta Airlines, Inc.,* 405 U.S. 707 [92 S.Ct. 1349, 31 L.Ed.2d 620] (1972); *Clark v. Paul Gray, Inc.,* 306 U.S. 583 [59 S.Ct. 744, 83 L.Ed.2d 1001]

14. There is overlap between the various "prongs" of the *Complete Auto* test. Appellees' "cost per mile" argument concerning the nature of flat taxes generally, and the marker fee specifically, clearly raises discrimination concerns under the third prong as well as the fourth. *See e.g., Commonwealth Edison Co. v. Montana, supra* at 453 U.S. 620, 101 S.Ct. 2955 ("appellants' discrimination theory [that the tax burden borne by the out-of-state consumers of Montana coal is excessive] ... is, of course, merely a variant of appellants' assertion that the Montana tax does not satisfy the 'fairly related' prong....").

(1939); *Ingels v. Morf,* 300 U.S. 290 [57 S.Ct. 439, 81 L.Ed.2d 653] (1937).[12]

12. As the Court has stated, "such imposition, although termed a tax, cannot be tested by standards which generally determine the validity of taxes." *Interstate Transit, Inc. v. Lindsey,* 283 U.S. 183 [51 S.Ct. 380, 75 L.Ed. 953] (1931). Because such charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that "the fees charged do not appear to be manifestly disproportionate to the services rendered...." *Clark v. Paul Gray, Inc.,* 306 U.S. at 599 [59 S.Ct. at 753], *Ingels v. Morf,* 300 U.S. at 296–297 [57 S.Ct. at 442–443].

453 U.S. at 621–22 & n. 12, 101 S.Ct. at 2955–56 & n. 12 (parallel citations omitted).

In *Evansville-Vanderburgh Airport, supra,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), the United States Supreme Court rejected a Commerce Clause challenge to the imposition of a $1.00 per passenger fee imposed by the airport authority upon each passenger enplaning on a commercial airplane. The Court there stated:

We ... regard it as settled that a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike.... The facility provided at public expense aids rather than hinders the right to travel. A permissible charge to help defray the cost of the facility is therefore not a burden in the constitutional sense.

*       *       *       *       *       *

Our decisions concerning highway tolls are instructive. They establish that the States are empowered to develop "uniform, fair and practical" standards for this type of fee ... (Numerous citations omitted.)

We have also held that a State may impose a flat fee for the privilege of using its roads, without regard to the actual use by particular vehicles, so long as the fee is not excessive. *Aero Mayflower Transit Co. v. Georgia Public Service Comm'n,* 295 U.S. 285 [55 S.Ct. 709, 79 L.Ed. 1489] (1935); *Morf v. Bingaman,* 298 U.S. 407 [56 S.Ct.

756, 80 L.Ed. 1245] (1936); *Aero Mayflower Transit Co. v. Board of Railroad Comm'rs,* 332 U.S. 495 [68 S.Ct. 167, 92 L.Ed. 99] (1947). And in *Capitol Greyhound Lines v. Brice,* 339 U.S. 542 [70 S.Ct. 806, 94 L.Ed. 1053] (1950), the Court sustained a Maryland highway toll of "2% upon the fair market value of motor vehicles used in interstate commerce." That toll was supplemental to a standard mileage charge imposed by the State, so that "the total charge as among carriers [did] vary substantially with the mileage traveled." *Id.* [339 U.S.], at 546 [70 S.Ct. at 808]. It was there argued, however, that the correlation between tax and use was not precise enough to sustain the toll as a valid user charge. Noting that the tax "should be judged by its result, not its formula, and must stand unless proven to be unreasonable in amount for the privilege granted," *id.,* at 545 [70 S.Ct. at 808], the Court rejected the argument:

"Complete fairness would require that a state tax formula vary with every factor affecting appropriate compensation for road use. These factors, like those relevant in considering the constitutionality of other state taxes, are so countless that we must be content with 'rough approximation rather than precision.' *Harvester Co. v. Evatt,* 329 U.S. 416, 422–423 [67 S.Ct. 444, 447, 91 L.Ed. 390]. Each additional factor adds to administrative burdens of enforcement, which fall alike on taxpayers and government. We have recognized that such burdens may be sufficient to justify states in ignoring even such a key factor as mileage, although the result may be a tax which on its face appears to bear with unequal weight upon different carriers. *Aero Transit Co. v. Georgia Comm'n,* 295 U.S. 285, 289 [55 S.Ct. 709, 710, 79 L.Ed. 1439]. Upon this type of reasoning rests our general rule that taxes like that of Maryland here are valid unless the amount is shown to be in excess of fair compensation for the privilege of using state roads." *Id.* [339 U.S.], at 546–547 [70 S.Ct. at 809].

405 U.S. at 714–716, 92 S.Ct. at 1354–1355 (parallel citations omitted).

■ Furthermore, the fact that a flat tax imposed upon all commerce, interstate and local alike, *may* have a greater impact upon interstate commerce, *if* such commerce actually uses the services or facilities less than local [15] commerce, is inconsequential to our Commerce Clause analysis. Interstate motor carriers are free to use the Commonwealth's highways as often and for whatever distances they wish and cannot be heard to complain that, because they choose to use those highways less frequently than motor carriers whose vehicles are registered in Pennsylvania *may* use them, the burden of the flat fee falls too heavily upon them. "One who receives a privilege without limit is not wronged by his own refusal to enjoy it as freely as he may." *American Trucking Associations, Inc. v. Goldstein*, 301 Md. 372, 483 A.2d 47 (1984) *quoting Aero Mayflower Transit Co. v. Georgia Public Service Commission*, 295 U.S. 285, 289, 55 S.Ct. 709, 711, 79 L.Ed. 1439 (1935). *See also Aero Mayflowers Transit Co. v. Board of Railroad Comm'rs.*, 332 U.S. 495, 68 S.Ct. 167, 92 L.Ed. 99 (1947); *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed.2d 1001 (1939); *Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 70 S.Ct. 806, 94 L.Ed. 1053 (1950).

Thus, so long as the flat fee charged is not manifestly disproportionate to the services rendered, *i.e.*, not excessive, the fee is "fairly related" to those services for Commerce Clause purposes. Moreover, the burden is on the challenger to demonstrate that the flat fee is excessive in relation to the services charged. *Clark v. Paul Gray, Inc., supra* 306 U.S. at 599, 59 S.Ct. at 753 and cases cited therein; *Evans-*

**15.** Given the nature of the interstate motor carrier industry, it is not apparent that non-Pennsylvania registered vehicles use the Commonwealth's highways less frequently than their Pennsylvania counterparts. Some do and some do not. There are many Pennsylvania registered motor carrier vehicles, indeed some who are members of ATA, who do most of their interstate traveling outside of Pennsylvania, and the converse is also frequently the case. Brief for Appellants at 22, n. 15.

*ville-Vanderburgh Airport, supra.* Appellees have failed to sustain this burden.

■ All Pennsylvania highway user fees are deposited into the Motor License Fund and expended solely for road-related purposes. JSF para. 64. For the period from April 1, 1981 through November 30, 1982, total highway user fees collected from all motor carrier vehicles subject to the marker fee amounted to approximately $304 million. JSF para. 99. The marker fee portion of the Motor Carrier Road Tax Act for that period was approximately $12,594,-000.00. JSF paras. 70 and 71. For that same period, Motor License Fund expenditures for highway construction and maintenance, state police services and construction bond debt service totalled approximately $1½ *billion.* JSF paras. 46–51. While cars and other vehicles not subject to the marker fee also use the Commonwealth's highways and benefit from these expenditures, JSF para. 52, use of the highways by the heavier vehicles subject to the marker fee necessitate significantly higher road-related expenditures than these lighter vehicles in the categories of construction of road bases and surfaces, construction of bridges, paving of road shoulders, roadgrading and drainage and truck weight facilities. JSF para. 53. It is apparent that appellees have failed to sustain their burden of demonstrating that the marker fee is excessive, manifestly disproportionate to the services rendered or not fairly related to those services.

For the foregoing reasons, we hold that the Commonwealth Court erred in declaring Act 68 and then-in-effect section 2102(b) of the Vehicle Code (the marker fee) unconstitutional under the Commerce Clause, and we therefore reverse that decision and order.

B. THE AXLE TAX—ACT 234 AMERICAN TRUCKING II

■ The axle tax is a modified flat fee since it is imposed in accordance with actual use for motor carrier vehicles traveling less than 2,000 miles annually in the Common-

wealth and at a flat $36.00 per axle fee after 2,000 miles are traveled. Again, the tax clearly passes constitutional muster under the first two facets of *Complete Auto*, the "substantial nexus" and "fairly apportioned" requirements. The principal challenge to the validity of the axle tax is premised upon the third and fourth prongs of the *Complete Auto* standard, namely, that it discriminates against interstate commerce and that it is not "fairly related to services provided."

Obviously, the axle tax itself, standing alone, is incapable of discrimination. Section 9902 of the Vehicle Code imposes the $36.00 per axle fee on "every truck, truck tractor or combination having a gross weight or gross registered weight in excess of 26,000 pounds operated on the highways of this Commonwealth." On its face and in actual operation, this axle tax is collected from Pennsylvania and non-Pennsylvania registered vehicles alike.

The difficulty, however, is when we place the axle tax in conjunction with all other relevant taxing provisions, as we must, particularly Act 234's simultaneous reduction of the registration fees paid by Pennsylvania registered vehicles subject to the axle tax. As noted, that registration fee reduction almost exactly offsets the $36.00 per axle tax. Appellees argue that Act 234, therefore, was intended to and actually did discriminate against interstate commerce and impose the full brunt of the axle tax upon interstate (non-Pennsylvania registered) commerce. At first blush, this is an appealing argument.

Appellants concede that in reducing the Pennsylvania registration fees by amounts offsetting the $36.00 per axle tax, it indeed intended to lessen the burden imposed upon "local commerce." However, appellants deny that the effect of this reduction in registration fees is to discriminate against interstate commerce in favor of local commerce. Rather, appellants contend that Act 234 "effects a rational restructuring of Pennsylvania's highway user charges"

which is a lawful and non-discriminatory restructuring under the Commerce Clause. We agree.

The Commonwealth Court held:

[W]e conclude that the assessment facially discriminates against interstate commerce. The registration fee reductions almost always offset assessments, virtually insulating operators of locally but not foreign, registered vehicles from the levy's financial impact. Since the Axle Tax discriminatorily affects the operators of foreign-registered vehicles, who bear the full brunt of the tax, the assessment constitutes economic protectionism and is facially invalid.

87 Pa.Commw. at 383, 487 A.2d at 467.

Once again, the Commonwealth Court's focus was far too narrow. Non-Pennsylvania registered motor carrier vehicles pay the $36.00 per axle tax plus the $5.00 marker fee; motor carrier vehicles registered in an IRP jurisdiction pay the axle tax plus an apportioned Pennsylvania registration fee; Pennsylvania registered motor carrier vehicles pay the axle tax plus the full Pennsylvania registration fee. There is no discrimination against interstate commerce in such a taxing scheme in practical operation. In focusing solely on the registration fee *reductions*, the Commonwealth Court ignores the fact that "local commerce" (Pennsylvania registered motor carrier vehicles) remains subject to substantial highway user fees that "interstate commerce" (vehicles owned by members of the class and subclass represented by appellees) is not subject to.

We reiterate that the focus of the Commerce Clause must always be upon the actual effect or economic consequences of the state tax upon interstate commerce.

A state tax must be assessed in light of its actual effect *considered in conjunction with other provisions of the State's tax scheme.* "In each case it is our duty to determine whether the statute under attack, *whatever its name may be,* will in its practical operation work discrimination against interstate commerce. (emphasis added.)

*Maryland v. Louisiana, supra* at 451 U.S. 756, 101 S.Ct. 2134.

In assessing the practical effect of Act 234, we need go no further than appellees' own illustration set forth in their class action complaint:

30. For example, under the annual registration fee schedule set out in Section 1916 for the 1982 registration year, a truck tractor and trailer combination registered in Pennsylvania for a maximum weight of 80,000 pounds would pay $1125 for a one-year registration.

31. For the 1983 registration year, that same five-axle combination will pay only $945 under the Section 1916 annual registration fee schedule as amended by Act 234. However, that combination must now also pay $36 per axle for each of its five (5) axles, or a total Axle Tax of $180.

32. The $945 registration fee plus the $180 Axle Tax paid by the motor carrier operating a Pennsylvania-based vehicle will cause it to pay $1125 to register its vehicle in the Commonwealth—exactly the same amount as the registration fee prior to Act 234.

Complaint paras. 30–32. To this illustration, we add the undisputed fact that the comparable fees for a five-axle, 80,000 pound combination registered in a foreign, non-IRP jurisdiction and operating in Pennsylvania will be $185.00, *i.e.,* an axle tax of $180.00 plus $5.00 marker fee.

Thus, while appellees are correct that a Pennsylvania registered five-axle, 80,000 pound combination pays the same total amount in registration fees and axle tax that it paid solely in registration fees prior to the passage of Act 234, this fact does not prove any discriminatory effect. Rather, the operative fact is that the Pennsylvania registered combination is subject to an *additional* $940.00 in highway user fees that its counterpart registered in a foreign, non-IRP jurisdiction is not subject to. Similarly, a five-axle, 80,000 pound combination registered in an IRP member jurisdiction will pay some portion of that *addition-*

*al* $940.00 registration fee that its counterpart in a foreign, non-IRP jurisdiction will not.

Members of the class and subclass represented by appellees ("interstate commerce") thus bear less of the burden of Pennsylvania's highway user fees than do Pennsylvania registered motor carrier vehicles ("local commerce"). Accordingly, the axle tax and Act 234, considered in conjunction with all other provisions of Pennsylvania's highway user fee system, works no discrimination against interstate commerce in practical operation. It is entirely proper for a state to enact a compensatory tax to neutralize or partially offset an economic advantage previously enjoyed by interstate commerce to the disadvantage of local commerce that was caused by operation of that state's taxing scheme. *Alaska v. Arctic Maid,* 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961); *Halliburton Oil Well Cementing Co. v. Reilly,* 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963); *Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937). In easing the burden on Pennsylvania registered vehicles, the Commonwealth has neither disadvantaged interstate commerce nor favored local commerce, and the axle tax does not, therefore, discriminate against interstate commerce.

The axle tax is also not excessive or unrelated to the services provided by the Commonwealth. The axle tax proceeds are deposited into the Highway Bridge Improvement Restricted Account within the Motor License Fund, 75 Pa.C.S.A. § 9907(a), and expended on bridge rehabilitation, replacement and removal projects, *id.* at § 9908. Expenditures under this bridge improvement program will exceed $1 billion over 5 years. (Additional revenues of $420 million from federal funding and $40 million from local governments will increase the expenditures by a like amount.) The axle tax revenues generated in fiscal year 1983–84 were approximately $68 million in axle tax fees from *all* interstate motor vehicles, and an additional $4.5 million in trip permit revenues which may be paid in lieu of the axle tax. 75 Pa.C.S.A. § 2102(d). (Appellees do not dispute

these figures for expenditures and revenues. *See* Appellant's Brief at 6, n. 6 and reproduced record at R. 156–58.)

Furthermore, rebates are given for "incidental use" (under 2000 miles annually) and trip permits are available for occasional use. Under all of these circumstances, appellees have failed to sustain their burden of demonstrating that the axle tax is excessive or is not fairly related to the services provided by the Commonwealth.

Appellees argue, and the Commonwealth Court held, that Act 234's reduction in Pennsylvania registration fees demonstrate a discriminatory intent and amounted to "economic protectionism." As Justice Benjamin Cardozo stated, "motives alone will seldom, if ever, invalidate a tax that apart from its motives would be recognized as lawful.... Catch words and labels, such as the words 'protective tariff' [or 'economic protectionism'], are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard." *Henneford v. Silas Mason Co., supra* at 300 U.S. 586, 587, 57 S.Ct. 529.

For the foregoing reasons, we hold that the Commonwealth Court erred in declaring Act 234 and section 9902 of the Vehicle Code (the axle tax) unconstitutional under the Commerce Clause, and we therefore reverse that decision and order.

## IV

### ADDITIONAL CONSTITUTIONAL CHALLENGES

In all three cases before us, the class action plaintiffs have also challenged the highway user fees on equal protection, uniformity, and privileges and immunities grounds. Almost all of their efforts have been devoted to attacking the highway user fees on Commerce Clause grounds, and the remaining constitutional issues are *all* premised on allegations of discriminatory effect. Since we have determined that neither the marker fee nor the axle tax work a discriminatory effect upon interstate commerce, these re-

maining constitutional challenges must therefore be rejected.

## V

## AMERICAN TRUCKING III

As appellants (ATA and the two non-Pennsylvania corporations) in this case inform us, this action is identical to that of *American Trucking I* except for the time frame for which refunds have been sought. Since we have rejected the constitutional challenges to the marker fee in *American Trucking I*, appellants' challenge here must necessarily fail. Accordingly, we will affirm the order and decision of the Commonwealth Court sustaining appellees' preliminary objections in this case and need not address the propriety of that court's ruling regarding exhaustion of remedies.

## VI

Accordingly, the following orders are entered:

The order of the Commonwealth Court entered in No. 315 C. D.1982, 87 Pa.Commw. 345, 487 A.2d 468 (1985), *American Trucking I*, is reversed, appellants' exceptions are granted and judgment is entered for appellants.

The order of the Commonwealth Court entered in No. 267 C. D.1983, 83 Pa.Commw. 379, 487 A.2d 465 (1985), *American Trucking II*, is reversed, appellants' motion for summary judgment is granted and judgment is entered for appellants.

The order of the Commonwealth Court entered in No. 160 C. D.1984, 87 Pa.Commw. 418, 489 A.2d 269 (1985), *American Trucking III*, is affirmed.

Flaherty, J., did not participate in the consideration or decision of this case.

Nix, C.J., files a concurring and dissenting opinion in which he "agrees with the results reached by the majority in *American Trucking I*, No. 11 M.D.Appeal Docket 1985, and *American Trucking III*, No. 19 M.D.Appeal Docket

1985", but dissents in *American Trucking II,* No. 12 M.D. Appeal Docket 1985; McDermott, J., joins this concurring and dissenting opinion.

NIX, Chief Justice, concurring and dissenting.

While I agree with the results reached by the majority in *American Trucking I,* No. 11 M.D.Appeal Docket 1985, and *American Trucking III,* No. 19 M.D.Appeal Docket 1985, I believe the analysis employed by the majority in *American Trucking II,* No. 12 M.D.Appeal Docket 1985, reflects less than a full comprehension of the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3.

The basic purpose of the Commerce Clause is to prohibit a state from taxing interstate commerce in a manner which discriminates against interstate commerce "by providing a direct commercial advantage to local business." *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959). It is thus necessary to examine the Axle Tax for Highway Bridge Improvement Act ("Axle Tax"), Act of December 8, 1982, P.L. 842, No. 234, 75 Pa.C.S. §§ 9901 *et seq.* ("Act 234"), to determine whether it discriminates in favor of local interests to the derogation of the free flow of interstate commerce.

As recognized by the majority, the seminal case setting forth the mode of analysis under the Commerce Clause is *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). In that case the Supreme Court overruled a series of cases which had held that any state tax on "the privilege of doing business" imposed on a multi-state business was *per se* unconstitutional. *See, e.g., Spector Motor Service, Inc. v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951); *Freeman v. Hewit,* 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946). The Court favored an approach which looked to the practical effect of the challenged state tax statute. *Complete Auto Transit, Inc. v. Brady, supra* 430 U.S. at 279, 97 S.Ct. at 1079. Under this approach a tax is sustained against a Commerce Clause

challenge when it (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. *Id.* *See also Maryland v. Louisiana,* 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981), *citing Washington Revenue Dept. v. Washington Stevedoring Assn.,* 435 U.S. 734, 750, 98 S.Ct. 1388, 1399, 55 L.Ed.2d 682 (1978).

It is only when all four conditions of *Complete Auto Transit, Inc. v. Brady, supra,* are met that a state tax is not *per se* invalid because it burdens interstate commerce, since interstate commerce may constitutionally be made to pay its way. *Maryland v. Louisiana, supra* 451 U.S. at 754, 101 S.Ct. at 2133. As stated in *Maryland:*

A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme. "In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Best & Co. v. Maxwell,* 311 U.S. 454, 455–456 [61 S.Ct. 334, 335, 85 L.Ed. 275] (1940). See *Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 69 [83 S.Ct. 1201, 1203, 10 L.Ed.2d 202] (1963); *Gregg Dyeing Co. v. Query,* 286 U.S. 472, 478–480 [52 S.Ct. 631, 633–635, 76 L.Ed. 1232] (1932).

*Maryland v. Louisiana, supra,* 451 U.S. at 756, 101 S.Ct. at 2134.

This standard was succinctly phrased by the Commonwealth Court in *American Trucking II,* 87 Pa.Commw. 379, 487 A.2d 465 (1985):

Commerce Clause jurisprudence distinguishes between two types of legislation: (1) protectionist measures that are infused with discriminatory purpose or effect and (2) facially neutral acts that regulate evenhandedly to promote legitimate local interests, with incidental effects on interstate commerce. *See Philadelphia v. New Jersey,* 437 U.S. 617, 624 [98 S.Ct. 2531, 2535, 57 L.Ed.2d 475] (1978). Economic protectionist legislation is subject to a

"virtually *per se* rule of invalidity," while a facially neutral measure is invalidated whenever burdens on interstate commerce clearly outweigh putative local benefits. *Id.*

*Id.* 87 Pa.Commw. at 382, 487 A.2d at 467.

It is therefore incumbent upon the reviewing court to determine whether the challenged statute, in practical operation, works discrimination against interstate commerce in purpose or effect.

Turning to the statute challenged in *American Trucking II*, I believe the majority incorrectly focuses upon the plethora of rationalizations submitted in support of the Axle Tax rather than the practical operation of the Axle Tax itself. Section 3 of Act 234 assessed a maximum tax of thirty-six (36) dollars per axle against both foreign-registered and Pennsylvania-registered motor carrier vehicles that travel at least two thousand (2000) miles annually in Pennsylvania having a gross weight or registered gross weight in excess of twenty-six thousand (26,000) pounds. Section 1 of Act 234, however, simultaneously amended section 1916(a) of the Vehicle Code, 75 Pa.C.S. § 1916(a), and beginning with the weight class upon which the Axle Tax is first imposed (twenty-six thousand (26,000) pounds), reduced the annual Pennsylvania truck registration fees in multiples of thirty-six (36) dollars.[1]

1. The reductions correspond to the number of axles most commonly used and minimally required by law in each weight class. *See* 75 Pa.C.S. § 4941. The following schedule is illustrative:

| CLASS | WEIGHT | AMOUNT REDUCED |
|---|---|---|
| 9 | 26,001–30,000 | $ 72 |
| 10 | 30,001–33,000 | 72 |
| 11 | 33,001–36,000 | 72 |
| 12 | 36,001–40,000 | 72 |
| 13 | 40,001–44,000 | 108 |
| 14 | 44,001–48,000 | 108 |
| 15 | 48,001–52,000 | 108 |
| 16 | 52,001–56,000 | 108 |
| 17 | 56,001–60,000 | 108 |
| 18 | 60,001–64,000 | 144 |

The Commonwealth Court found that "[w]hile Section 3 of Act 234 assesses an Axle Tax against all designated vehicles operating in Pennsylvania, Section 1 of Act 234, by authorizing comparable registration fee reductions, negates or mitigates the financial impact of the Axle Tax on Pennsylvania-registered vehicles." *See American Trucking II, supra* at 382, 487 A.2d at 467. The court concluded that Act 234 amounted to economic protectionist legislation which facially discriminated against interstate commerce. *Id., quoting Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Maryland v. Louisiana, supra.* I agree.

Appellants concede the unequal financial impact of Act 234. Appellants' Brief at 12. The primary thrust of appellants' argument is that the legislative purpose behind Act 234 was to effect a rational restructuring of Pennsylvania's highway user charges. *Id.* at 17–18. Appellants place great weight upon the fact that Act 234 impacts the most upon those vehicles which have in the past not paid any Pennsylvania registration fees, *i.e.,* out-of-state vehicles not participating in the IRP program. *Id.* at 16–17. Appellants also argue that both before and after the enactment of Act 234, Pennsylvania registered trucks pay more money to

| CLASS | WEIGHT | AMOUNT REDUCED |
|-------|--------|----------------|
| 19 | 64,001–68,000 | 144 |
| 20 | 68,001–73,280 | 144 |
| 21 | 73,281–76,000 | 180 |
| 22 | 76,001–78,000 | 180 |
| 23 | 78,001–78,500 | 180 |
| 24 | 78,501–79,000 | 180 |
| 25 | 79,001–80,000 | 180 |

Except in a few instances, the reductions created by the Act were intended to and did exactly offset the impact of the Axle Tax upon motor carrier vehicles registered in Pennsylvania. For example, under the annual registration fee schedule in force just prior to the Act, a five-axle truck tractor and trailer combination registered in Pennsylvania for a maximum weight of 80,000 pounds was subject to a one-year registration fee of $1125. For the 1983 Axle Tax registration year, that same five-axle combination still was only subject to a total fee of $1125. The reduced registration fee was $945 and the five-axle combination was subject to a tax of $36 per axle, or an Axle Tax of $180. The total ($945 + $180 = $1,125) is exactly the same amount as the registration fee prior to the passage of the Act.

Pennsylvania for the privilege of using its roads then do vehicles registered elsewhere. *Id.* at 19. Additionally, appellants contend that the restructuring effected by Act 234 will attract more vehicle registration in Pennsylvania. *Id.* at 20. Nevertheless, as the following Commerce Clause analysis as set forth by decisions of the United States Supreme Court demonstrates, appellants' factual assertions as to the purpose of Act 234 do not raise that act, which on its face discriminates against interstate commerce, to a level of constitutionality.

The basic fallacy of the majority's analysis is its acceptance of appellants' premise that the legislative purpose of Act 234 was to restructure Pennsylvania's highway user charges. It is notable, however, that there is nothing in the statute itself or in the circumstances surrounding the enactment of Act 234 which adds legitimacy to appellants' position that it was designed to restructure the tax burden upon the trucking industry in this Commonwealth. In fact, the legislature expressed a clearly parochial purpose, the rehiring of Pennsylvania's unemployed, for the enactment of the Axle Tax. Section 9907(b) of the tax states:

> (b) **Purpose of tax.**—It is the declared policy of the Commonwealth that the money raised by the tax imposed by this chapter be used, to the greatest extent possible, *to provide for the creation of jobs and the rehiring of the unemployed in this Commonwealth.* In order to reach this goal, firms with *Pennsylvania-based facilities* shall be actively solicited to make bids on contracts to furnish products and materials, including, but not limited to, steel and steel products, to be used in the projects funded through the Highway Bridge Improvement Restricted Account.

75 Pa.C.S. § 9907(b) (emphasis added).

Thus, appellants' argument that the purpose of the Axle Tax was to effect a rational restructuring of tax burdens is specious, and the majority's reliance upon this assertion rises to no higher level. Moreover, even though the Commonwealth has a legitimate interest in providing employ-

ment for Pennsylvanians, I find that in the instant case the state chose an unconstitutional means to effect this goal.

In *Philadelphia v. New Jersey, supra,* the State of New Jersey raised the argument that its statute prohibiting the importation of most solid or liquid waste which originated or was collected outside the territorial limits of the State was actually no more than a legislative effort to suppress competition and to stabilize the cost of solid waste disposal for New Jersey residents. *Id.* at 626, 98 S.Ct. at 2536. In answer to this argument on legislative purpose, the Supreme Court wrote:

> *This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case.* Contrary to the evident assumption of the state court and the parties, the evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim ... is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of all waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. *But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect [this statute] violates this principle of nondiscrimination.*

*Id.* at 626–27, 98 S.Ct. at 2536–37 (emphasis added).

The Supreme Court of the United States has consistently found parochial legislation such as Act 234 invalid, regardless of the ultimate legislative goal. *See, e.g., Toomer v. Witsell,* 334 U.S. 385, 403–04, 68 S.Ct. 1156, 1165–66, 92 L.Ed. 1460 (1948) (goal to create jobs by keeping industry

within the State); *Edwards v. California,* 314 U.S. 160, 173–74, 62 S.Ct. 164, 166–67, 86 L.Ed. 119 (1941) (attempt to preserve the State's financial resources from depletion by fencing out indigent immigrants); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 522–24, 55 S.Ct. 497, 500–01, 79 L.Ed. 1032 (1935) (aim was to assure a steady supply of milk by erecting barriers to allegedly ruin outside competition). These cases show that the presence of a presumably legitimate goal, *i.e.,* rehiring of unemployed Pennsylvanians, does not constitutionalize a state statute which operates to discriminate against vehicles solely because of their origin. Act 234, by effecting a tax burden only upon those out-of-state vehicles with no financial nexus to Pennsylvania's registration fee, imposes a tax based solely upon out-of-state origin.

In response to the majority's observations that Act 234 impacts most upon out-of-state vehicles which have not in the past paid any of Pennsylvania's registration fee, and that the "reallocation" effected by Act 234 will attract more vehicle registration in Pennsylvania, I counter that these observations do nothing more than to demonstrate the discriminatory nature of Act 234. As I previously quoted, "[t]he basic purpose of the Commerce Clause is to prohibit a state from taxing interstate commerce in a manner which discriminates against interstate commerce 'by providing a direct commercial advantage to local business.'" *Northwestern States Portland Cement Co. v. Minnesota, supra* 358 U.S. at 458, 79 S.Ct. at 362. State legislatures can neither protect local businesses nor seek to induce businesses to locate in the state by way of burdening only interstate commerce. *See Maryland v. Louisiana, supra; Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977); *Best & Co., Inc. v. Maxwell,* 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940). Thus, the majority's observations manifest the very evils the Commerce Clause was designed to protect against.

The majority relies heavily on the fact that Pennsylvania-registered vehicles pay more fees to Pennsylvania than do

out-of-state registered vehicles. What the majority ignores, however, is that every state maintains a system for registering trucks and every state imposes fees and taxes in conjunction with such registration. Just as Pennsylvania-registered vehicles pay a registration fee to the state of Pennsylvania, so do out-of-state registered vehicles pay such a fee in their respective jurisdictions. Naturally, a state has a rational basis for exacting more fees from in-state-registered vehicles than from out-of-state registered vehicles. Thus, the majority's revelation of the "operative fact" that Pennsylvania-registered vehicles are subject to $940.00 in registration fees which the foreign-registered, non-IRP counterparts are not subject to, comes as no startling surprise. The practical operation of Act 234, which does not restructure the entire Pennsylvania user fee system, does not serve to achieve equal treatment, rather it serves instead to shift an additional financial burden *only* upon interstate commerce.[2] The protectionist nature of this legislation is evident and cannot be ignored. Should every state impose such a tax to burden only out-of-state registered vehicles, the impact upon interstate commerce would indeed be crippling.[3]

Appellants attempt to hinge the legal determination of the constitutionality of Act 234 upon the fact that Pennsylvania is a member of the IRP, an interstate compact. Those out-of-state vehicles participating in the IRP program are also benefited by the decrease in the registration fees under Act 234. This argument erroneously assumes that

**2.** The majority's reasoning leads them to the inherently inconsistent statement that the "easing" of the burden on Pennsylvania registered vehicles does not favor local commerce. *See* p. 855. Earlier in the majority opinion it is noted that in reducing the Pennsylvania registration fees, it was "intended to lessen the burden imposed upon 'local commerce.'" *Id.* at 853.

**3.** Moreover, contrary to the majority's implication that the out-of-state registered vehicles have in the past received a "free ride" on the roads of Pennsylvania, foreign registered vehicles are subject to payment of *inter alia:* (a) special hauling permit fees; (b) the Fuel Use Tax; (c) the Motor Carriers' Road Tax; (d) the Oil Company Franchise Tax; (e) the Gross Receipts Tax; and (f) the Liquid Fuels Tax. Joint Stipulation of Facts at R. 308–09.

the Commerce Clause analysis is somehow based upon the percentage of discrimination effected by the statute. *See Maryland v. Louisiana, supra* 451 U.S. at 760, 101 S.Ct. at 2136.[4] As the following facts demonstrate, however, the discrimination effected by Act 234 is substantial, notwithstanding, or rather because of, the presence of the IRP compact.

Vehicles registered in IRP jurisdictions pay to each member state in which the vehicle travelled that year, a percentage of the state's registration fee apportionally related to the miles travelled in that state compared to the vehicle's total mileage for that year. Of the total 403,656 vehicles upon which the 1983 axle tax was paid, 83,118 (21%) were Pennsylvania-registered and 126,466 (31%) were from other IRP jurisdictions. *See* Letter from the Office of the Attorney General, dated May 1, 1984 at R. 321, *et seq.* The remaining 194,072 (48%) vehicles upon which the Axle Tax was paid by residents of non-IRP jurisdictions who owned out-of-state registered vehicles. *Id.* The large size of this latter figure is explained by the fact that Pennsylvania, although an IRP state, is completely surrounded by non-IRP jurisdictions.

Hence, those jurisdictions most immediate to Pennsylvania and most likely to travel on Pennsylvania highways are fully impacted by the Axle Tax. Those out-of-state vehicles derive no benefit from the corresponding decrease in registration fees under Act 234, and pay Axle Tax fees to further the parochial purpose of providing employment for Pennsylvania residents. By contrast, Pennsylvania-registered vehicles as well as those vehicles participating in the IRP program are practically fully exempt from the tax because of the corresponding decrease in registration fees under Act 234.

4. In *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), the Supreme Court wrote, "[w]e need not know how unequal the Tax is before concluding that it unconstitutionally discriminates." *Id.* at 760, 101 S.Ct. at 2136.

The legal issue presented by the case at bar is synonymous with that presented in *Maryland v. Louisiana, supra,* which involved Louisiana's tax on the "first use" of any natural gas brought into Louisiana which was not previously subjected to taxation by another State or the United States. The primary effect of the tax, which was imposed on pipeline companies, was on gas produced in the federal Outer Continental Shelf (OCS) and then piped to processing plants in Louisiana and, for the most part, eventually sold to out-of-state consumers. The first-use tax statute (Act) as well as provisions of other Louisiana statutes, provided a number of exemptions from and credits for the tax whereby Louisiana consumers of OCS gas for the most part were not burdened by the tax, but it uniformly applied to gas moving out of the State.

The Supreme Court of the United States found Louisiana's First Use Tax unconstitutional under the Commerce Clause using the following analysis:

*In this case, the Louisiana First-Use Tax unquestionably discriminates against interstate commerce in favor of local interests as the necessary result of various tax credits and exclusions. No further hearings are necessary to sustain this conclusion.* Under the specific provisions of the First-Use Tax, OCS gas used for certain purposes within Louisiana is exempted from the Tax. . . . Competitive users in other States are burdened with the Tax. Other Louisiana statutes, enacted as part of the First-Use Tax package, provide important tax credits favoring local interests. Under the Severance Tax Credit, an owner paying the First-Use Tax on OCS gas receives an equivalent tax credit on any state severance tax owed in connection with production in Louisiana. . . . *On its face, this credit favors those who both own OCS gas and engage in Louisiana production. The obvious economic effect of this Severance Tax Credit is to encourage natural gas owners involved in the production of OCS gas to invest in mineral exploration and development within Louisiana rather than to invest in further OCS*

*development or in production in other states.* Finally, under the Louisiana statutes, any utility producing electricity with OCS gas, any natural gas distributor dealing in OCS gas, or any direct purchaser of OCS gas for consumption by the purchaser in Louisiana may recoup any increase in the cost of gas attributable to the First-Use Tax through credits against various taxes or a combination of taxes otherwise owed to the State of Louisiana.... Louisiana consumers of OCS gas are thus substantially protected against the impact of the First Use Tax.... OCS gas moving out of the State, however, is burdened with the First-Use Tax.

451 U.S. at 756–58, 101 S.Ct. at 2134–35 (footnote omitted, emphasis added).

The above analysis is persuasive that Act 234 facially discriminates against interstate commerce by virtually insulating operators of locally, but not foreignly registered vehicles from its financial impact. Like the Louisiana scheme, the Pennsylvania Axle Tax directly discriminates in favor of local interests. The reductions in multiples of thirty-six (36) dollars correspond to the number of axles ordinarily required on vehicles within each affected weight class. The result is that in almost all instances, the registration fee reductions exactly offset the impact of the Axle Tax upon carriers operating vehicles that are registered in Pennsylvania. The practical effect of the reductions is to exempt Pennsylvania-registered vehicles from the Axle Tax.

Two recent decisions of the Supreme Court of the United States also mandate a finding of unconstitutionality in the instant case. In *Bacchus Imports, Ltd. v. Dias, Director of Taxation of Hawaii,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the State of Hawaii imposed a 20% excise tax on sales of liquor at wholesale. To encourage the development of the Hawaiian liquor industry, however, a brandy distilled from the root of an indigenous shrub of Hawaii, and a fruit wine manufactured in the State were exempted from the tax. The Supreme Court held that the tax exemption for the brandy and the fruit wine violated the

Commerce Clause because it had both the purpose and effect of discriminating in favor of local products. The Court found it insignificant that the sales of the exempted beverages constituted only a small part of the total liquor sales in Hawaii. It stated that as long as there is some competition between the exempt beverages and the non-exempt products from outside the State, there was a discriminatory effect. The Court also stated that it is irrelevant to the Commerce Clause inquiry that the legislature's motivation was the desire to aid the makers of the locally produced beverages rather than to harm out-of-state producers.

Similarly, in *Westinghouse Electric Corporation v. Tully,* 466 U.S. 388, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984), the Court held unconstitutional a New York tax scheme which not only provided an incentive for increased business activity in New York, but also penalized increases in shipping activities in other states. The Court held that whether the New York tax diverted new business into the State or merely prevented current business from being diverted elsewhere, it was still a discriminatory tax that creates an advantage for firms operating in New York by placing a discriminatory burden on commerce to its sister states.

Under the standard set forth in *Complete Auto Transit, Inc. v. Brady, supra,* a statute which discriminates against interstate commerce cannot be sustained. As previously noted, "[a] state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme." *Maryland v. Louisiana, supra* 451 U.S. at 756, 101 S.Ct. at 2134. The key determination is whether, in practical effect, the statute will work discrimination against interstate commerce. *Complete Auto Transit, Inc. v. Brady, supra* 430 U.S. at 279, 97 S.Ct. at 1079; *Best & Co. v. Maxwell, supra* 311 U.S. at 455–56, 61 S.Ct. at 334–35. Here, although the thirty-six (36) dollar per axle is a tax imposed upon all vehicles of designated classes, whether foreign or Pennsylvania registered, the corresponding reductions in Pennsylvania registration fees demonstrate a legislative intent to provide a direct commercial

advantage to local business. *See Northwestern States Portland Cement Co. v. Minnesota, supra* 358 U.S. at 458, 79 S.Ct. at 362. I thus conclude that Act 234 is a protectionist measure infused with discriminatory purpose and effect. *See Philadelphia v. New Jersey, supra.* As the Supreme Court observed in *Best & Co., Inc. v. Maxwell, supra,* "[t]he Commerce Clause forbids discrimination, whether forthright or ingenious." *Id.* 311 U.S. at 455, 61 S.Ct. at 335.

Accordingly, I would affirm the order of the Commonwealth Court entered in *American Trucking II,* docketed at No. 12 M.D. Appeal Docket 1985, and hold that the Axle Tax is unconstitutional to the extent that it discriminates against interstate commerce by providing a direct commercial advantage to Pennsylvania-registered truckers.

McDERMOTT, J., joins in this concurring and dissenting opinion.